UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

State of Missouri,                                              Civil No. 06-1616 (PAM)

              Plaintiff,

v.                                                              **MEMORANDUM AND ORDER**

United States Army Corps of Engineers;
Francis J. Harvey, Secretary of the
Army, United States Department of
Defense; and Brigadier General Gregg F.
Martin,

              Defendants.

---

This matter is before the Court on cross-Motions for Summary Judgment. For the reasons set forth below, the Court grants Defendants' Motion and denies Plaintiff's Motion.

**BACKGROUND**

In this lawsuit, the State of Missouri ("Missouri") is challenging the March 2006 Revisions ("Revisions") to the Missouri River Mainstem Reservoir System Master Water Control Manual ("Master Manual").[1] Missouri alleges two basic claims. First, it contends that the Army Corps of Engineers ("Corps") violated the National Environmental Policy Act (NEPA) by preparing an environmental assessment (EA) instead of a supplemental environmental impact statement (SEIS). Second, Missouri claims that the Corps violated NEPA by not considering a full range of alternatives to the Revisions.

---

[1] The Master Manual is a guide used by the Army Corps of Engineers to operate the system of six dams on the Missouri River reservoir system.

**A.**     **The Revisions to the Master Manual**

In March 2004, pursuant to this Court's Order, the Corps issued a Final Environmental Impact Statement (FEIS) for the review and update of the Master Manual. A Record of Decision (ROD) followed, which revised the Master Manual. The ROD directed the Corps to formulate a spring pulse plan that complied with the provisions of the 2003 Amended BiOp completed by the Fish and Wildlife Service (FWS).[2] The Corps and the FWS enlisted the aid of the United States Institute for Environmental Conflict Resolution (USIECR), a federal agency specializing in dispute resolution. USIECR invited basin state, tribal, and basin stakeholder representatives to participate in a collaborative spring pulse plan identification process. USIECR and the participants selected a professional facilitator to assist in developing technical criteria for a bimodal spring pulse release plan. This process led to the formation of a "Plenary Group" comprised of more than fifty members including Missouri. The Plenary Group met four times between June and August 2005 and received input from four technical working groups. Despite this collaboration, the Plenary Group did not reach a consensus on a spring pulse plan, but the Corps used the information generated by the Plenary Group to develop a draft Annual Operating Plan (AOP) for 2006 and to formulate draft water control criteria for the spring rise.

On October 24, 2005, the Corps released for public review and comment the Draft 2005-2006 AOP and the Draft Spring Pulse Water Control Plan Technical Criteria for spring

---

[2]The 2003 Amended BiOp in part called for bimodal spring pulse releases to benefit the endangered pallid sturgeon.

pulses from Gavins Point Dam. The Corps conducted public meetings and received written comments until December 16, 2005. After this process was concluded, the Corps performed an EA to address the purpose of and need for bimodal spring pulse releases and to determine whether a SEIS was warranted for the proposed bimodal spring rise. The EA compared the environmental impacts of a bimodal spring pulse release plan with a range of alternative spring pulse proposals, which had been previously analyzed by the Corps. The EA also compared the flow regime resulting from the bimodal spring pulse technical criteria with the flow regime since regulation of the river system began. Based on these comparisons, the EA concluded that the environmental impacts of a bimodal spring pulse release plan were within the range of impacts of the previously considered alternatives. In addition, the Corps's assessment of the resulting flows showed that the flows would be within the range of historical operations. The EA concluded there were no new significant environmental impacts of the proposed action that had not already been evaluated in the FEIS. The Corps consequently determined that an EA was sufficient, and accordingly, supplementation of the FEIS was not required.

The technical criteria defining the spring pulse releases are included in the Master Manual at Appendix I. The Revisions establish a bimodal spring rise: one in March and another in May of each year. The March pulse may not exceed 5,000 cubic feet per second (cfs), and the May pulse may not exceed 20,000 cfs. Each pulse has a two-day peak duration. The Corps also evaluated the potential effects of the bimodal spring rise and concluded that the plan would not significantly increase the risk of flooding or drainage problems. This

conclusion was based on several factors. First, the magnitude of the May spring pulse release will be constrained by the downstream flow limits. Second, the Corps already has in place a monitoring plan for the spring pulse releases, which addresses the effects of the spring pulse on interior drainage and groundwater, the biological impacts on the pallid sturgeon and its habitat, and the potential impacts to historic and cultural properties.

In February 2006, the FWS informed the Corps that the technical criteria for the bimodal spring pulse releases from Gavins Point Dam met the requirements of the 2003 Amended BiOp. Following this, the Corps completed the EA, and Defendant Brigadier General Gregg F. Martin, the Corps's Division Engineer for the Northwestern Division, signed a Memorandum of Decision approving the Revisions.

**B.   The 2006 Spring Rise**

No March rise occurred in 2006 because the system storage on March 1, 2006, was less than 36.5 million acre-feet (MAF). On May 1, 2006, however, the system storage exceeded 36.5 MAF, and the May rise began on May 12, 2006. This date was within the May 1 to May 19 timeframe for the beginning of the rise to occur. The May rise increased the flow to the full magnitude of the release: 9,000 cfs per day above the 16,000 cfs that was provided to support minimum navigation. At that point, the flow rate of 25,000 cfs was maintained for two days. According to Missouri, fourteen plover nests with thirty-four eggs were lost because of the May rise.

**DISCUSSION**

**A.     The Administrative Procedures Act**

A NEPA challenge is brought pursuant to the Administrative Procedures Act (APA). Marsh v. Or. Natural Res. Council, 490 U.S. 360, 375-76 (1989). Thus, the Court must determine whether the Corps's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, the Court's review is narrow, evaluating whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment. Marsh, 490 U.S. at 378. The Court may not substitute its judgment for that of the agency. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).

**B.     Standing**

Defendants first seek summary judgment on the issue of standing, arguing that Missouri has not shown any injury to itself from the Revisions to the Master Manual. The jurisdiction of the federal courts is limited to actual cases and controversies. Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992). Among other requirements, a "case or controversy" requires a plaintiff to have standing to litigate the action. To establish standing, a plaintiff must show (1) an injury in fact, (2) a causal connection between the injury and the conduct, and (3) a likelihood of redressability. Id.

Missouri has satisfied this test. In South Dakota v. Ubbelohde, the Eighth Circuit Court of Appeals held that the State of Nebraska had standing to intervene in litigation involving the Master Manual because "the Missouri River runs through the State of

Nebraska" and Nebraska would be harmed by a reduction in flow. 330 F.3d 1014, 1024 (8th Cir. 2003); accord Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1130 (11th Cir. 2005) ("Corps management of Lake Lanier that violates federal law may adversely impact the environment and economy downstream . . . thereby injuring Alabama and Florida. A favorable decision in this case could provide redress for that injury. Thus, we readily conclude that Florida and Alabama have standing to pursue this action."). In this case, Missouri claims that it will be harmed by the Revisions because of reduced flood protection and diminished water supply. Striking the Revisions could redress these harms. Accordingly, Missouri has satisfied the Lujan factors.[3]

**C.     The EA Claim**

Missouri contends that the Corps should have formally supplemented the FEIS rather than rely on the EA to revise the Master Manual. Defendants argue that the Corps fully complied with NEPA in revising the Master Manual.

In determining whether a decision not to supplement an environmental impact statement (EIS) was arbitrary and capricious, "courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." Marsh, 490 U.S. at 378. However, supplementation of an EIS is not required "every time new information

---

[3] The Court notes additionally that the Corps never challenged Missouri's standing in the multidistrict litigation regarding the Master Manual.

comes to light after the EIS is finalized." Id. at 373. "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." Id. Rather, an agency must prepare a SEIS if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or if "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c); see also Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 431 F.3d 1096, 1102 (8th Cir. 2005). Section 1502.9(c) "is interpreted to require a SEIS 'if the changed plans or circumstances will affect the quality of the human environment in a significant manner . . . not already considered by the federal agency.'" Ark. Wildlife Fed'n, 431 F.3d at 1102 (quoting Airport Impact Relief, Inc. v. Wykle, 192 F.3d 197, 204 (1st Cir. 1999)).

Here, the Corps considered the environmental impacts of revising the Master Manual to include bimodal spring pulse releases. The EA was tiered and linked to the 2004 FEIS and incorporated its analysis. The EA compared the environmental impacts of the proposed technical criteria with a range of alternative spring pulse proposals. The EA also compared the flow regime resulting from the bimodal spring pulse technical criteria with the flow regime since regulation of the system began. Based on these comparisons, the EA concluded that the environmental impacts of bimodal spring pulse releases were within the range of impacts of previously considered alternatives. Indeed, the March pulse is relatively small, not to exceed 5,000 cfs. This is not a significant departure from normal fluctuations under

7

the current water control plan. The May pulse is also similar to rises previously studied in the FEIS, which examined a total of eleven spring pulse alternatives, all occurring in May, with peak rises ranging from 15,000 to 30,000 cfs over navigation flows, and with a two-week peak period. The May spring pulse in the EA consisted of a release between 9,000 and 20,000 cfs above navigation flows for a two-day peak duration. Thus, the EA provides for both a smaller release and a shorter duration than previous alternatives. This supports the Corps's conclusion that the smaller, shorter spring pulses will not present environmental impacts substantially different from the alternatives previously analyzed. Further, the resulting flows will be within the range of historical operations. The EA concluded that there were no new significant environmental impacts of the proposed action that had not been evaluated in the FEIS. The Court finds no misstep in the Corps's arrival at this conclusion.

Missouri faults the Corps for considering only the environmental impacts of a bimodal spring rise, rather than studying the alternative itself. Missouri depicts the bimodal spring pulse release plan as a substantial change from previously considered alternatives, thereby requiring a SEIS. Missouri's argument lacks merit. The implementation of a bimodal, rather than a single, rise was not a substantial change so as to warrant supplementation of the FEIS. A change is "substantial" when "it presents a 'seriously different picture of the environmental impact.'" Ark. Wildlife Fed'n, 431 F.3d at 1102 (quoting S. Trenton Residents Against 29 v. Fed. Highway Admin., 176 F.3d 658, 663 (3d Cir. 1999)). "To determine whether a change is substantial we look at the possible environmental consequences not previously considered." Id. (citing Marsh, 490 U.S. at 374). Here, the bimodal spring rise alternative

did not present a significantly different picture of the environmental consequences. In fact, the Revisions actually reduce the environmental impacts because the rises will be of smaller magnitude and duration than a single rise. "Although we do not hold that a reduction in the environmental impact can never trigger the requirement to prepare a SEIS, 'a reduction in the environmental impact is less likely to be considered a substantial change relevant to environmental concerns than would be an increase in the environmental impact.'" Id. at 1103 (quoting Friends of the Bow v. Thompson, 124 F.3d 1210, 1218-19 (10th Cir. 1997)).

Missouri's attempt to distinguish the present case from Arkansas Wildlife Federation is unavailing. The case is directly on point, dealing with both changes to an agency's original plan and with new information. 431 F.3d at 1099-1100. On the other hand, Dubois v. U.S. Dep't of Agric., 102 F.3d 1273 (1st Cir. 1996), on which Missouri relies, is unpersuasive. See Ark. Wildlife Fed'n, 431 F.3d at 1103 (distinguishing Dubois). The change in this case was one of frequency, not the adoption of an entirely new alternative. See id.

Missouri next contends that the Corps acted arbitrarily and capriciously by using the EA to determine that a SEIS was not required. To the contrary, the Court finds that the Corps's use of the EA in this regard was permissible. Cf. Marsh, 490 U.S. at 378 (upholding the Corps's use of a supplemental information report to conclude that no SEIS was necessary). Title 33 C.F.R. § 230.10(a) provides that an EA is used to determine whether an EIS is required, and it stands to reason that an EA may also be used to determine whether to supplement an EIS. Missouri has no authority that the Corps improperly used the EA, and

9

NEPA does not require the use of any particular document to analyze whether to supplement an EIS.

Similarly, the Corps was not required to issue a finding of no significant impact (FONSI) before declining to prepare a SEIS. The Corps may base its decision to forgo a SEIS merely on the fact that a revision does not provide a seriously different result than what was previously considered. See Wisconsin v. Weinberger, 745 F.2d 412, 418 (7th Cir. 1984). In the present case, the Corps determined that the Revisions would result in significant environmental impacts, but also that those impacts had been previously analyzed. Although an agency must issue a FONSI before declining to issue an initial EIS, see 33 C.F.R. § 230.11; 40 C.F.R. § 1508.13, there is no authority that a FONSI must be prepared every time an agency opts not to supplement an EIS.

Finally, Missouri faults the Corps for not circulating the EA for public comment and for not soliciting public involvement in its decision not to prepare a SEIS. However, neither of these actions was required. See 40 C.F.R. § 1501.4(e)(2); Alliance To Protect Nantucket Sound, Inc. v. U.S. Dep't of Army, 398 F.3d 105, 115 (1st Cir. 2005); Friends of the Clearwater v. Dombeck, 222 F.3d 552, 560 (9th Cir. 2000). Moreover, the Corps provided for extensive public participation, in which Missouri was thoroughly involved.

The Court has carefully reviewed the administrative record and is satisfied that the Corps made a sound decision not to supplement the FEIS. The Corps did not make substantial changes in the proposed action relevant to environmental concerns, nor was there significant new information bearing on the proposed action. Thus, the Corps did not act

arbitrarily or capriciously in this regard. Likewise, the Corps did not act arbitrarily or capriciously in relying on the EA to revise the Master Manual, in declining to prepare a FONSI, and by not circulating the EA for public comment before deciding not to prepare a SEIS.

**D.     The Range of Alternatives Claim**

Missouri claims that the Corps did not adequately consider a range of alternatives to the Revisions. NEPA requires agencies to consider reasonable, feasible alternatives to proposed action. See 42 U.S.C. § 4332(2)(C)(3); 40 C.F.R. § 1502.14(a); Mo. Mining, Inc. v. ICC, 33 F.3d 980, 984 (8th Cir. 1994); Robinson v. Knebel, 550 F.2d 422, 425 (8th Cir. 1977).

The Court finds that in revising the Master Manual, the Corps considered numerous alternatives both in the EA itself and by tiering and linking the EA to the FEIS. In the FEIS, the Corps analyzed eleven alternatives for a spring pulse plan, all with a peak magnitude from 15,000 to 30,000 cfs over navigation flows. In addition, the eleven alternatives considered pulses in the May timeframe over a four-week period. These analyses were incorporated into the EA. The EA also examined a number of other alternatives: the Initial Starting Point Plan, a No Action Alternative, and the Preferred Alternative, which was ultimately selected. Thus, the Corps analyzed a total of fourteen alternatives in considering the impacts of a spring pulse plan. The Corps concedes that it limited its analysis of alternatives to those complying with the FWS's recommendation in the 2003 Amended BiOp, but it did so in order to safeguard the endangered pallid sturgeon. If the Corps had

ignored the recommendation, it risked substantial penalties for taking an endangered species. See Bennett v. Spear, 520 U.S. 154, 170 (1997). The Corps did not err by limiting its analysis of alternatives to those complying with the FWS recommendations in the 2003 Amended BiOp.

The EA also compared the impacts of the bimodal spring pulse technical criteria with the impacts of the spring pulse alternatives evaluated in the FEIS. Specifically, the EA looked at the impacts of the alternatives on the normal operating range, flood control, hydropower, water supply, recreation, navigation, total national economic development, young-of-year fish production, reservoir coldwater fish habitat, coldwater river fish habitat, river warmwater fish habitat, riverine native fish physical habitat, riverine tern and plover habitat, wetland habitat, riparian habitat, and historic and cultural properties. The EA further compared the flow regime of a bimodal rise with that of the flow regime since regulation of the river system began.

Based on these considerations, the Court finds that the Corps did not act arbitrarily or capriciously in considering reasonable, feasible alternatives to the bimodal spring pulse release plan. Defendants are entitled to summary judgment on this point.

**CONCLUSION**

The Corps did not violate NEPA by preparing an EA rather than supplementing the FEIS when it implemented the Revisions to the Master Manual. The Corps also complied with NEPA in its consideration of a range of alternatives to the Revisions. The Corps fully analyzed the environmental impacts of the Revisions and adhered to all administrative and

regulatory requirements.  Therefore, the Revisions to the Master Manual were not made arbitrarily, capriciously, or contrary to law, and Defendants are awarded summary judgment on both of Missouri's claims.[4]  Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment (Docket No. 15) is **GRANTED**; and

2. Plaintiff's Motion for Summary Judgment (Docket No. 18) is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: November 2, 2006

                                                              s/ Paul A. Magnuson
                                                              Paul A. Magnuson
                                                              United States District Court Judge

---

[4] Because Missouri's Motion for Summary Judgment is denied, its request for injunctive relief is denied as moot.